ATTORNEY FOR APPELLANT
Deidre L. Monroe
Gary, Indiana

ATTORNEYS FOR APPELLEE
INDIANA DEP'T OF CHILD SERVS.
Gregory F. Zoeller
Attorney General of Indiana

Eugene M. Velazco, Jr.
Indiana Dep't of Child Servs.,
Gary, Indiana

Robert J. Henke
Indiana Dep't of Child Servs.,
Indianapolis, Indiana

ATTORNEY FOR APPELLEE LAKE
COUNTY COURT APPOINTED
SPECIAL ADVOCATE
Donald W. Wruck, III
Dyer, Indiana

_____

## In the
## Indiana Supreme Court



_____

No. 45S03-1308-JT-557

IN THE MATTER OF THE TERMINATION OF THE
PARENT-CHILD RELATIONSHIP OF
E.M. AND EL.M.,

E.M.,

           *Appellant (Respondent),*

v.

INDIANA DEPARTMENT OF CHILD SERVICES,

           *Appellee (Petitioner).*

_____

Appeal from the Lake Superior Court, Juvenile Division, Nos. 45D06-1102-JT-41 and 45D06-1102-JT-42
The Honorable Mary Beth Bonaventura, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 45A03-1208-JT-370

_____

**March 7, 2014**

**Rush, Justice.**

      Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference

to the trial courts, recognizing their superior vantage point for weighing the evidence and assessing witness credibility. Because a case that seems close on a "dry record" may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence.

We granted transfer to reiterate that caution. Father's eventual efforts to establish a relationship with his children were commendable, and DCS's family preservation efforts with him could have been stronger. Yet the standard of review requires us to consider only the evidence favorable to the judgment—and in turn, to respect the trial court's reasonable conclusion that Father's efforts were both too little in view of his violence and earlier pattern of hostility toward services, and too late in view of the children's urgent need for permanency after several years in out-of-home placement. The evidence was sufficient to support termination, so we defer to the trial court and affirm its judgment.

**Facts and Procedural History**

In late 2008, one-year-old E.M., his newborn sister El.M., and their five older half-siblings[1] were adjudicated CHINS, based on reports of Father's repeated domestic violence against Mother. The children were initially allowed to remain in the home on the condition that Father stay away, but were removed a few months later after Father violated that condition.

Besides the order to stay away from the home, the CHINS disposition also required Father to establish his paternity of E.M. and El.M.; to undergo a psychological evaluation and counseling for domestic violence, anger management, and parenting; and to have only supervised visits with the children. His only efforts in those matters consisted of attending two domestic-violence counseling sessions and (viewing disputed evidence favorably to the judgment) a single visit with the children after they were removed from the home. Moreover, Father was hostile and verbally abusive to service providers, and he denied that any domestic violence had occurred—even though police identified him as the aggressor in a March 2009 incident, shortly after the children's removal, where he admittedly bit Mother's face and Mother stabbed him in the abdomen. Father failed to appear for all but the first two CHINS hearings, then dropped out of contact with DCS. As a result, DCS

---

[1] Father and both children share the initials E.M. To distinguish them, we refer to Father as "Father," to the older child as "E.M.," and the younger child as "El.M." The other children are not Father's and are not involved in this appeal.

discontinued services to Father in mid-2009—and unbeknownst to DCS, Father was incarcerated in Illinois for a felony firearm conviction beginning in September 2009.

By mid-2010, Mother too had fallen out of compliance with services, and the children had been removed from the home for more than fifteen of the previous twenty-two months. DCS therefore petitioned to terminate Mother's and Father's parental rights, and adoption by relatives became an alternative permanency plan. And by early Spring 2011, E.M., El.M., and two of their half-siblings had been placed with their maternal grandmother R.E., who planned to adopt them.

Immediately after his release from prison in January 2012, Father contacted DCS, told them of his incarceration, and asked to resume visitation with E.M. and El.M. But DCS did not permit any visits because the visitation order had been conditioned on Father's participation in court-ordered services, which he had abandoned—though he had completed parenting and anger-management classes in prison. Father also resumed attendance at hearings. But by then, adoption by R.E. had long since become the sole permanency plan, and DCS continued to pursue termination.

At the final hearing, the witnesses for DCS and CASA unequivocally recommended terminating Father's parental rights. They explained that E.M.'s and El.M.'s older half-siblings had post-traumatic stress disorder (PTSD) and were afraid of Father because of the domestic violence they'd witnessed, and that there had never been any "bonding" between Father and E.M. and El.M. The children had been removed from the home for nearly three and a half years and were thriving in placement with R.E. As the Permanency Family Case Manager summarized, "[w]e can't keep starting [the children] over," because it would be unfair to them "to wait around for [the] parents to get on board" with reunification.

The trial court's order essentially agreed with DCS's view. It found that Father "continues to deny that he has issues with domestic violence," that he "has not completed any counseling or therapy," and "has not seen his children in over two years." It acknowledged that Father "has recently attempted to comply with the case plan," but noted that he also "had ample opportunity before his incarceration to comply, which he refused. The children cannot wait three years for a parent to comply." The court therefore terminated Father's parental rights, and he appealed.

A divided panel of the Court of Appeals reversed by unpublished memorandum decision. In re E.M., No. 45A03-1208-JT-370 (Ind. Ct. App. May 8, 2013), trans. granted, 993 N.E.2d 182

3

(Ind. 2013). The majority held that the trial court unduly "emphasize[d] Father's past conduct and minimize[d] his recent progress and efforts at the time of the termination hearing." Slip op. at 10. The majority emphasized that despite Father's early non-compliance, he had completed parenting and anger-management classes while in prison, contacted DCS upon his release in hopes of seeing the children, undergone a psychological evaluation, and completed or nearly completed additional parenting and anger-management classes by the time of the final hearing. Id. at 10–11. Thus, the majority concluded that the trial court placed too much weight on Father's past conduct without sufficiently "taking into consideration evidence of changed conditions" at the time of the termination hearing. Id. at 11 (citing In re I.A., 903 N.E.2d 146, 154 (Ind. Ct. App. 2009)). Judge Kirsch dissented without separate opinion. Id. at 12.

We granted transfer, vacating the Court of Appeals opinion, and now conclude that the Court of Appeals majority contravened the standard of review by reweighing the evidence. We therefore affirm the trial court's judgment. Additional facts will be supplied as necessary.

**Standard of Review**

We have repeatedly recognized that "parental rights are precious and protected by our Federal and State constitutions." E.g., In re Adoption of C.B.M., 992 N.E.2d 687, 692 (Ind. 2013). Accordingly, when seeking to terminate parental rights, DCS must prove its case by "clear and convincing evidence," Ind. Code § 31-37-14-2 (2008)—a "heightened burden of proof" reflecting termination's "serious social consequences." In re G.Y., 904 N.E.2d 1257, 1260–61 & n.1 (Ind. 2009).

But weighing the evidence under that heightened standard is the trial court's prerogative— in contrast to our well-settled, highly deferential standard of review. "We do not reweigh the evidence or determine the credibility of witnesses, but consider only the evidence that supports the judgment and the reasonable inferences to be drawn from the evidence." Egly v. Blackford Cty. Dept. of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992). We confine our review to two steps: whether the evidence clearly and convincingly supports the findings, and then whether the findings clearly and convincingly support the judgment. K.T.K. v. Indiana Dep't of Child Servs., 989 N.E.2d 1225, 1229–30 (Ind. 2013) (quoting In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010)).

Reviewing whether the evidence "clearly and convincingly" supports the findings, or the findings "clearly and convincingly" support the judgment, is not a license to reweigh the evidence.

4

Rather, it is akin to the "reasonable doubt" standard's function in criminal sufficiency of the evidence appeals—in which "we do not reweigh the evidence or assess the credibility of the witnesses," and consider only whether "there is probative evidence from which a *reasonable jury could have* found the defendant guilty beyond a reasonable doubt." Treadway v. State, 924 N.E.2d 621, 639 (Ind. 2010) (emphasis added). That is, we do not independently determine whether that heightened standard is met, as we would under the "constitutional harmless error standard," which requires *the reviewing court itself* to "be sufficiently confident to declare the error harmless beyond a reasonable doubt." Harden v. State, 576 N.E.2d 590, 593 (Ind. 1991) (citing Chapman v. California, 386 U.S. 18 (1967)). Our review must "give 'due regard' to the trial court's opportunity to judge the credibility of the witnesses firsthand," and "not set aside [its] findings or judgment unless clearly erroneous." K.T.K., 989 N.E.2d at 1229 (citing Ind. Trial Rule 52(A)).

## Discussion and Decision

Father challenges the sufficiency of the evidence to support terminating his parental rights, arguing that DCS failed to prove every necessary element of its case by "clear and convincing evidence." So far as relevant here, DCS had to prove four elements: (1) E.M. and El.M. "ha[d] been removed from the parent for at least six (6) months under a dispositional decree"; (2) "there is a reasonable probability that the conditions that resulted in the child[ren]'s removal or the reasons for placement outside the home of the parents will not be remedied"; (3) "termination is in the best interests of the child[ren]"; and (4) "there is a satisfactory plan for the care and treatment of the child." I.C. § 31-35-2-4(b)(2) (2008). On transfer, Father's arguments focus principally on the second and third elements—whether there is "clear and convincing evidence" of a reasonable probability that he would fail to remedy the domestic violence that led to the children's removal, and whether terminating any relationship with their father is in the children's best interests. We address each argument in turn.

## I. Remedying Conditions Resulting in Removal.

In determining whether "the conditions that resulted in the child[ren]'s removal . . . will not be remedied," id., we "engage in a two-step analysis," K.T.K., 989 N.E.2d at 1231. First, we identify the conditions that led to removal; and second, we "determine whether there is a reasonable probability that those conditions will not be remedied." Id. (quoting I.A., 934 N.E.2d at

5

1134) (internal quotation marks omitted). In the second step, the trial court must judge a parent's fitness "as of the time of the termination proceeding, taking into consideration evidence of changed conditions," Bester v. Lake Cty. Office of Family & Children, 839 N.E.2d 143, 152 (Ind. 2005)—balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." K.T.K., 989 N.E.2d at 1231 (quoting Bester, 839 N.E.2d at 152) (internal quotation marks omitted). We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination. See K.T.K. at 1234.[2] Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior.

Here, the neglect and domestic violence that resulted in the children's removal, see I.C. § 31-34-1-1(1) (2008), were so severe that E.M.'s and El.M.'s older half-siblings *fled from the home to call 911* during previous incidents, and witnessing the violence had caused them to suffer post-traumatic stress disorder (PTSD). And the violence was serious enough that when police arrived to investigate the incident that triggered the CHINS case, Father hid from them on the roof of the house. Yet the violence escalated still further during the CHINS case—culminating in the admitted biting and stabbing incident in March 2009. Against that background, Father's prior pattern of apathy toward services and hostility toward service providers is significant—as is his testimony minimizing his domestic violence as merely becoming "upset beyond necessity" or "overreacting," and shifting the blame to unspecified people who had "attacked" him and made him "angry":

> I admit that I have gotten upset, uh, beyond the necessity for things that I, for, uh,
> I have felt I have been attacked on certain levels and it has made me angry, yes, and

---

[2]  Accord In re W.B., 772 N.E.2d 522, 534 (Ind. Ct. App. 2002) ("[T]he trial court did consider the Parents' improved circumstances, but found the short-term improvements insufficient to outweigh the Parents' habitual patterns of conduct. We find no fault with this conclusion."); In re C.M., 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997) ("Although [Mother] argues that she had started to comply with the dispositional order shortly before the termination hearing, it was within the province of the trial court, as the finder of fact, to ignore or discredit this evidence."). See also, e.g., In re A.J., 881 N.E.2d 706, 714–16 (Ind. Ct. App. 2008), trans. denied; In re D.D., 804 N.E.2d 258, 266 (Ind. Ct. App. 2004), trans. denied; In re D.G., 702 N.E.2d 777, 779 (Ind. Ct. App. 1998) (all stating that while parental fitness should be judged as of the date of the termination proceedings, trial court must also consider the parent's historical patterns of conduct in determining the probability of future neglect, deprivation, or other detrimental behavior).

I agree, you know, that, uh, maybe I have overreacted. I think that, yeah, I'm probably guilty of it.

Tr. 190.

In view of that evidence, the trial court entered a number of specific findings of fact, which illuminate how it weighed Father's past history against his recent efforts:

- The children were referred to DCS "due to domestic violence in the home between [M]other and [F]ather."

- "Services were made available to all the parents," including "anger management[ and] domestic violence counseling . . . ."

- Father "continued . . . to live in the home, and the children and [M]other were being abused in the home" until they "had to be removed in February 2009."

- Father "denied all services offered" and "refused to comply with any of the service providers" until services for him "ceased . . . due to his non-compliance and lack of contact."

- Father "continues to deny that he has issues with domestic violence."

- Father "has not completed any counseling or therapy."

- "Even though [Father] has recently attempted to comply with the case plan, he has had ample opportunity before his incarceration to comply, which he refused."

It is apparent from those findings that the trial court was unpersuaded by Father's recent efforts—inferring instead from his past hostility toward services that he was unlikely to succeed in remedying a domestic-violence problem that he refused to even acknowledge. So viewed, the findings are sufficient to clearly and convincingly support the judgment.

The more difficult issue in this case, though, is the threshold question of whether the evidence supports those findings. The dissenting opinion would hold that four of the findings—the children being abused in the home, Father denying all services offered, Father denying his issues with domestic violence, and Father failing to complete any counseling or therapy—are "unsupported by any evidence whatsoever," slip op. at 2; and that the remaining findings are "wholly insufficient to support the trial court's judgment," id. at 4. But even though the evidence and potential inferences were conflicting, the record sufficiently supports the trial court's findings. We therefore respectfully disagree with our colleague.

7

A. *Father's abuse of the children.*

First, it was reasonable under the circumstances to find that Father's violence towards Mother had also "abused" E.M. and El.M.—the trial court was not required to believe that they were unaffected by the same violence that had caused their older half-siblings to develop PTSD. "[M]any people assume that very young children are not affected at all" by violence between their parents, "erroneously believing that they are too young to know or remember what has happened." Joy D. Osofsky, The Effects of Exposure to Violence on Young Children, 50 Am. Psychologist 782, 783 (1995). But "even in the earliest phases of infant and toddler development, clear associations have been found between exposure to violence and post-traumatic symptoms and disorders." Id. Indeed, "[t]he developing brain is most vulnerable to the impact of traumatic experiences" *before age one*—and during the first *three* years, those experiences actually change the organization of the brain's neural pathways. Abigail Sterne et al., Domestic Violence and Children: A Handbook for Schools and Early Years Settings 19 (2010) (citations omitted); Allan N. Schore, The Effects of Early Relational Trauma on Right Brain Development, Affect Regulation, and Infant Mental Health, 22 Infant Mental Health J. 201, 209–10 (2001).

A lack of beatings therefore does not equate to a lack of abuse, nor does the children's tender age equate to a lack of harm. Infants as young as fifteen months exhibit behavioral disturbances from spousal violence. Charles H. Zeanah, et al, Disorganized Attachment Associated with Partner Violence: a Research Note, 20 Infant Mental Health J. 77, 82–83 (1999). And for later infants and toddlers like El.M. and E.M., the symptoms are "very similar to post-traumatic stress disorder in adults." Joy D. Osofsky, The Impact of Violence on Children, 9 Domestic Violence & Children 33, 36 (1999) (citing Osofsky et al., The Effects of Trauma on Young Children: A Case of Two-Year-Old Twins, 76 Int'l J. Psychoanalysis 595 (1995)). But "[y]ounger children generally do not have the ability to express their feelings verbally"—so their "observable reactions . . . may not tally with their emotional reactions," and "[i]t may take some time before children are able to show any reaction at all" despite being affected. Sterne et al., supra, at 20. Based on the older half-siblings' PTSD diagnoses and the younger children's even greater vulnerability to psychological harm, the trial court was within its discretion to find that Father's violence against Mother had also abused E.M. and El.M.

8

*B. Father's denial of all services offered.*

Second, the finding that Father "denied all services offered" was also proper. That finding is followed later in the same paragraph by another finding that he "recently attempted to comply with the case plan." Reading those findings together, we find it to be clear in context that the court was referring only to Father's *pre-incarceration* refusal of services—a matter he does not substantially dispute. Moreover, that refusal of services was accompanied by his failure to attend most of the CHINS hearings in the same timeframe—further illustrating what was, at least during that time, a deep-seated disregard of the children's needs and of any attempt to remedy the abusive conditions in their home. In its proper context, we find no error in this finding.

*C. Father's continued denial of issues with domestic violence.*

The trial court also had ample record basis to "fault Father for 'contin[uing] to deny that he has issues with domestic violence.'" Slip op. at 5. Father unequivocally testified that his problem was only anger, not violence. We are not being hyperliteral—he drew that distinction in no uncertain terms:

> Q  Sir, you stated you overreacted, um, sometimes, in terms of having some kind of domestic disturbances with [Mother]?
>
> A  No, that's not what I said.
>
> Q  That's not what you said?
>
> A  No, sir.
>
> Q  That you overreacted, that you would overreact?
>
> A  She said, did I ever have any anger issues, and I said, I do believe that in instances, I have overreacted—
>
> Q  Okay.
>
> A  —to, to, to, to where, the way I have been treated, uh, to, you know, in, when, when it relates to that situation and, and I could have, I could have responded better, that's what I said.  Yes, sir.
>
> Q  So you don't really feel like you have a violence, violent tendencies, or anything like that?
>
> A  I know I don't have violent tendencies—in terms of committing to harming someone, no, sir.

9

Q  All right. Well, back in 1993, you were convicted of Armed Robbery, did you, or did you not? [*sic*]

A  Yes, sir.[3]

Father's unequivocal denial of any issue with violence—despite his recent domestic violence and prior conviction for a violent crime—amply supports the trial court's similarly unequivocal finding.

Nor can we agree that there is any "lack of evidence that violence in Father and Mother's home would not be (and has not already been) remedied," as the dissent would hold. Slip op. at 8. The trial court was not required to ascribe weight to the three-year lack of domestic violence between Father and Mother, when Father was incarcerated for most of that time; nor was it required to credit Father's wife's testimony that he had never been violent towards her. Moreover, the risk factor in abusive relationships is the abuser, not the victim. "Deprived of their victim, many abusers will go on to abuse another intimate partner or family member. . . . [A]pproximately one-third of abusers will reabuse in the short run, and more will reabuse in the long run." Andrew R. Klein, Nat'l Inst. of Justice, Practical Implications of Current Domestic Violence Research: For Law Enforcement, Prosecutors and Judges 18–19 (2009), available at http://www.ncjrs.gov/pdffiles1/nij /225722.pdf. The trial court was not required to turn a blind eye to the statistical reality that an abuser—particularly one who denies having a problem—would be at higher risk of future abuse, even if his preferred victim was his girlfriend instead of his wife.

*D. Father not completing any counseling or therapy.*

Fourth and finally, the finding that Father "has not completed any counseling or therapy" was technically correct, albeit of limited probative value. The only evidence of Father "completing" anything like "counseling or therapy" was a "Certificate of Participation" in a "Parenting Education Program" about which Father presented no additional information, and a single sentence of Father's own testimony: "I also completed anger management while I was incarcerated." With no evidence

---

3  In view of this evidence, the dissent is correct that finding Father's recent imprisonment was for armed robbery was clearly erroneous. Instead, it was for a felony weapons possession charge. But it is the fact of imprisonment, not the nature of the underlying offense, that is most relevant to this case. Moreover, even a relatively old conviction for a violent offense like armed robbery is relevant in view of Father's recent domestic violence history. Conflating Father's old conviction with his recent imprisonment was error, but does not warrant reversal.

about the substance of the parenting program, the trial court was not required to consider it a form of counseling or therapy; nor was it obligated to credit Father's testimony about anger management. The remaining testimony was that Father had "one or two meetings left" for a second anger management class and had "attended" a second parenting class, and a document showing that he had attended one hour of alcohol and drug counseling (as part of a twelve-hour program)—but not that he had "completed" any of those. Given Father's *near*-completion of those subsequent classes, this finding standing alone could not support termination—but since the other findings are amply supported by the evidence, any shortfall in this finding does not undermine our confidence in the judgment.

To the contrary, the four findings we have particularly scrutinized highlight important differences between this case and Rowlett v. Vanderburgh Cty. Office of Family & Children, which also involved an incarcerated father. 841 N.E.2d 615 (Ind. Ct. App. 2006), trans. denied. There, children of similar ages (three and two) were removed from the home, adjudicated CHINS, and placed with their grandmother. Id. at 617–19. The father was imprisoned while the CHINS case was pending, and the case progressed to termination about three years after the children's removal, even though the father participated extensively in Department of Corrections programs that were appropriate to the issues (neglect and drug use) that were the basis for removal. Id. at 622. A divided panel of the Court of Appeals reversed the termination of the father's rights because he "should have [been] granted . . . a sufficient period following his release to demonstrate his willingness and ability to assume parental duties." Id. at 619–20.

But Father here is not similarly situated to Rowlett. There, the father had expressed desire for reunification starting on the very day the children were removed, and he was active in the CHINS case. Id. at 617–18. Further, he undertook *1,100 hours* of appropriate programs, and he maintained his relationship with the children by letters and phone calls from prison. Id. at 622. And critically, the father's testimony in Rowlett showed significant insight into his drug problem that led to the children's removal: "I never wanna use drugs again. It's ruined my life. It's ruined everything about me." Id. at 622. By contrast, Father here had nearly a year before incarceration to participate in court-ordered services yet did nearly nothing, including choosing not to appear for any but the first two CHINS hearings—and he made no effort to maintain his relationship with E.M. and El.M. while in prison, or even to notify DCS that he was there. And despite the programs

he participated in during and after his imprisonment, Father's testimony showed his continuing lack of insight into the domestic violence that led to the CHINS case.

The similarities between this case and Rowlett may have *permitted* the trial court to find in Father's favor—but unlike Rowlett, the evidence was not compelling enough to *require* it. Instead, as in K.T.K., it was not "clearly erroneous" for the trial court to find that Father's recent accomplishments, though commendable, were nevertheless outweighed by his historical patterns and ongoing failure to appreciate the extent of his domestic violence problems. The Court of Appeals' focus on Father's recent efforts was understandable, but nevertheless amounted to reweighing the evidence in violation of the standard of review.

## II. Termination in Children's Best Interests.

Perhaps the most difficult determination in a TPR is whether terminating parental rights is in the children's best interests—a question that necessarily places the children's interest in preserving the family into conflict with their need for permanency. As Father discussed at oral argument, social science research shows significant benefits to children when non-custodial fathers remain involved in their lives. E.g., Marcia J. Carlson & Katherine A. Magnuson, Low-Income Fathers' Influence on Children, 635 Annals of Am. Acad. Pol. & Soc. Sci. 95, 107 (2011) (collecting studies). Consistent with those findings, federal and state child-welfare laws mandate reasonable efforts "to preserve and reunify families." 42 U.S.C. § 671(a)(15) (2006); I.C. § 31-34-21-5.5(b) (2008). Attempting to preserve and reunify families promotes not just parents' fundamental liberty interest in raising their own children, see Troxel v. Granville, 530 U.S. 57, 65 (2000), but also the children's best interests. Marginal reunification efforts, then, come at the expense of children and parents alike.

But children also have a paramount need for permanency, which we have called "a central consideration in determining the child's best interests." K.T.K., 989 N.E.2d at 1235 (quoting G.Y., 904 N.E.2d at 1265) (substitutions omitted). Indeed, just as social science confirms the value of fathers, it also confirms the value of permanency. E.g., Thaddius A. Townsend, Going Before Solomon with a Special Request: The Need for Clearer Legal Recognition of Shared Custody Rights Between Parents and Nonbiological Parents, 41 Cap. U. L. Rev. 327, 351-52 (2013) ("Child welfare experts have recognized that legally secure permanent placement is necessary for a child's psychological stability and sense of belonging." (internal quotation marks omitted)). For that reason, our

12

laws that require reasonable family-preservation efforts are balanced by mandates aimed at accomplishing speedy permanency. As an example, federal and state laws require courts to hold a child's permanency hearing no later than 12 months after placement in foster care, 42 U.S.C. § 675(5)(C) (2006); I.C. § 31-34-21-7(a) (2008)—and as of October 1, 2013, to report annually on the median number of days to permanency in their child-welfare cases. Ind. Administrative Rule 1(F) (citing U.S. Dep't of Health & Human Servs., Admin. for Children & Families, ACYF-CB-PI-12-02, Program Instructions for the Court Improvement Program (2012), available at http://www.acf.hhs. gov/sites/default/files/cb/pi1202.pdf). Simply stated, children cannot wait indefinitely for their parents to work toward preservation or reunification—and courts "need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." K.T.K., 989 N.E.2d at 1235 (internal quotation marks omitted).

So while permanency is important in every TPR case, it was particularly urgent here—as reflected in the trial court's pointed finding that "[t]he children cannot wait three years for a parent to comply" with services. It was undisputed that at the time of the hearing, the children had been removed from the home for nearly three and a half years—since E.M. was barely a year old and El.M. was in early infancy. And they had lived and bonded with their grandmother R.E. for nearly a year and a half, while having never bonded with Father. Yet as the Court of Appeals observed, Father was still not "ready to parent E.M. and El.M., who currently do not know their father," and would likely need "additional services" in regard to parenting, domestic violence, and anger management. Slip op. at 11.

The final question, then—and the one central to this Court's difference of opinion—is whether Father's efforts after his release from prison *necessarily* made the children's interest in family preservation more compelling than their need for permanency after three years. We agree fully with the dissent that focusing on permanency, standing alone, would impermissibly invert the best-interests inquiry; and we must sadly concur that preservation efforts have too often been extended halfheartedly to non-custodial minority fathers. As both opinions' reliance on psychological and sociological research illustrates, child-welfare cases often implicate delicate social questions—and just as we have presumed the trial court's familiarity with research about the effects of domestic violence on children in the household, we expect our child-welfare courts to

be equally mindful of the dissent's crucial concerns. Terminating a fit parent's relationship with his children fails to advance the State's *parens patriae* interest, and gravely and irreparably harms families. That harm would be greater still if it were, even unconsciously, the product of racial bias.

But we perceive no such distortion in this particular case. Children's vital interests in both preservation and permanency are inherently at odds in TPR cases—all the more so in this case, for the policy reasons the dissent thoughtfully identifies. And while the evidence in TPR cases is often lopsided, it was a much closer call here, because Father's efforts to form a relationship with his children appear entirely genuine and demonstrate significant progress from his hostility toward services and service providers at the beginning of the case. Yet it was not unreasonable for the trial court to find the countervailing evidence even more compelling—that the children had waited nearly three and a half years to have a permanent home, that Father was still in no position to provide them with that home, that he had not even bonded with them, and that his failure to make progress in regard to his domestic violence did not bode well for his ability to do so in any reasonable amount of additional time.

We recognize that Father's incarceration played a substantial role in the lengthy delay and his failure to bond with the children—but incarceration alone cannot justify "tolling" a child-welfare case, as Father essentially seeks to do. First, Father cannot contend that those problems were merely a byproduct of imprisonment, when he had had nearly a year before then to engage in services and bond with his children, but failed to do so. And even after his apparent change of heart in prison, he could have notified DCS of his imprisonment, requested services, or at least sent progress reports from his prison programs. For that matter, he could have made at least some effort to communicate with E.M. and El.M., perhaps by sending cards or short letters, or by telephone as they became older—all of which Rowlett illustrates are viable from behind bars, even with children as young as two or three years old.

Still, we acknowledge that for all the reasons the dissent identifies, the evidence here was close, and Father's admirable efforts after his release from prison could have *permitted* a denial of TPR. Unlike Rowlett, though, the evidence does not *compel* denial, either—as it might if this case involved a shorter delay, some efforts by Father to forge a relationship with his children from prison, or greater insight into his domestic violence problem. Because the trial court could reasonably have

reached either conclusion, our deferential standard of review is dispositive. It was not clearly erroneous for the trial court to conclude that after three and a half years, Father's efforts simply came too late, and that E.M. and El.M. needed permanency even more than they needed a final effort at family preservation.

**Conclusion**

We recognize the great value of encouraging noncustodial fathers to be involved in their children's lives. Similarly, we acknowledge the efforts Father made toward that goal after his release from prison, in sharp contrast to his earlier hostility toward services. Yet despite his efforts, there were strong indications that he still had not come to terms with the domestic violence that triggered DCS's involvement. The children's best interests—especially their need for permanency after years in "temporary" placement—are paramount. After hearing the extensive testimony and reviewing voluminous exhibits, the trial court was within its discretion to find the children's needs to be weightier than Father's belated efforts. Because we may not reweigh that evidence, we affirm the trial court.

Dickson, C.J., and David and Massa, JJ., concur.

Rucker, J., dissents with separate opinion.

**Rucker, J., dissenting.**

In a carefully worded and well reasoned memorandum decision the Court of Appeals concluded there was insufficient evidence to support the trial court's judgment terminating Father's parental rights. In re E.M., No. 45A03-1208-JT-370 (Ind. Ct. App. May 8, 2013). It therefore reversed the judgment of the trial court. I agree with the Court of Appeals and thus respectfully dissent from the majority's contrary view.

The parent-child relationship is "one of the most valued relationships in our culture." Neal v. DeKalb Cnty. Div. of Family & Children, 796 N.E.2d 280, 285 (Ind. 2003) (quotation omitted). And a parent's interest in the upbringing of his or her child is "perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s]." Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality op.). It is thus not surprising that the United States Supreme Court has declared that before a State may completely and irrevocably sever a parent's parental rights, the State must at a minimum support its allegations by "clear and convincing" evidence. The Court has elaborated:

> When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it. "If the State prevails, it will have worked a unique kind of deprivation. . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one."

Santosky v. Kramer, 455 U.S. 745, 759 (1982) (quoting Lassiter v. Dep't of Social Servs. of Durham Cnty., 452 U.S. 18, 27 (1981)). Indeed, the issue extends beyond the parent's rights, but also includes the rights of the child to his or her family. See Karen A. Wyle, Fundamental Versus Deferential: Appellate Review of Terminations of Parental Rights, 86 Ind. L.J. Supp. 29, 35 (2011). "[T]he child and his parents share a vital interest in preventing erroneous termination of their natural relationship." Id. at 35-36 (quoting Santosky, 455 U.S. at 760). "While the State and the child share an obvious interest in protecting the child's welfare and safety, 'the State registers no gain towards its declared goals when it separates children from the custody of fit parents.'" Id. at 36 (quoting Stanley v. Illinois, 405 U.S. 645, 652 (1972)).

As the majority recognizes, we review the trial court's termination order to determine whether the evidence clearly and convincingly supports the trial court's findings and whether the findings clearly and convincingly support the judgment of termination. See slip op. at 4 (citing K.T.K. v. Ind. Dep't of Child Servs., 989 N.E.2d 1225, 1230 (Ind. 2013) (quotation omitted)). I agree this standard is "not a license to reweigh the evidence," id., but rather implements our appellate authority to reverse in the presence of clear error. See Tr. Rule 52(A). But, in following the Supreme Court's admonition to apply a heightened standard of proof in termination cases, we must be mindful that "a standard of proof loses much of its value if a reviewing court does not apply sufficient scrutiny to enforce it." Wyle, supra at 37.

Involving a mother, four fathers, and seven children, this case represents the efforts of one inner-city Father, attempting to "step up to the plate" and take responsibility for raising his children. In terminating Father's parental rights the trial court relied on several findings that were unsupported by any evidence whatsoever. Among the critical erroneous trial court findings were that "the children . . . were being abused in the home." Termination Order at 2.

In point of fact, there is absolutely no evidence in the record that E.M. and El.M. were *ever* abused. Relying on literature standing for the general proposition that young children may be affected by exposure to domestic violence, the majority concludes "it was reasonable under the circumstances to find that Father's violence towards Mother had also 'abused' E.M. and El.M." Slip op. at 8. The majority seems to equate exposure to violence as "abuse" apparently reasoning that if a child is so exposed then the child is affected by the exposure and thus abused. Even accepting such a proposition, there is simply nothing in this record upon which the trial court could find that either E.M. or El.M. "were being abused in the home." First, there is nothing in this record supporting the notion that E.M. or El.M ever observed the violence that occurred between Father and Mother. The case worker testified the "children had reported seeing" Father hit Mother on more than one occasion. Tr. at 60. But there were six children in the home at the time, with E.M. being the youngest. (El.M was not even born at the time). And as the caseworker explained she only interviewed "[t]he older children." Tr. at 57. More to the point, although the record shows that two of the older half-siblings were diagnosed with psychiatric disorders, the same was not true with respect to E.M. or El.M. The following

2

testimony from the children's caseworker at the May 2011 termination hearing goes to the heart of the matter:

> Q. [A]s it relates to what the children are doing at this point, [E.M.] and [El.M], have they been diagnosed with any type of issues?
>
> A. No.
>
> Q. So they are doing, uh, physically and mentally fine?
>
> A. Correct.

Tr. at 116. And although the therapist at the Carmelite Home where the children were placed from March 2009 to March 2011 found it necessary to provide therapy for the "older boys," Tr. at 124, the therapist testified, "[n]o, I haven't" to the question "as it relates to [E.M and El.M] have you had any relationship with them?" Tr. at 139. The inference if any that may be drawn from the testimony of the therapist is that had either E.M. or El.M exhibited any signs whatsoever of "psychological harm," slip op. at 8, then the therapist would have provided appropriate intervention. Further, the Case Manager's progress report dated April 16, 2010 reveals "[E.M.] is a two year old African American male child who appears healthy and is age appropriately active. [El.M] is a one year old African American female child. [El.M] appears healthy and active. . . . There have been no reported behavioral problems with [E.M.] or [El.M]." CHINS Progress Report, Apr. 16, 2010 at 2, 3. Similar observations were made in the progress reports dated January 7, 2011[1] and May 17, 2012.[2] Thus, on the record before us the majority's observation that "even in the earliest phases of infant and toddler development, clear associations have been found between exposure to violence and post-traumatic symptoms and disorders," slip op. at 8 (quotation omitted), is simply not applicable to E.M. and El.M. Absent any evidence that E.M. or El.M were exposed to domestic violence and if exposed were affected by it, the trial

---

[1] "[E.M] is a three year old African American male child who continues to develop age appropriately. [E.M.'s] socialization skills are improving. [El.M] is a two year old African American female child who continues to appear healthy and is appropriately active." CHINS Progress Report, Jan. 7, 2011 at 2.

[2] "[E.M.] is a four year old African American male child who is currently in preschool. [E.M.] is doing well in the home. [El.M] is a three year old African American female child who has been screened for preschool. [El.M] is doing well at home and gets along with her siblings." CHINS Progress Report, May 17, 2012 at 2. "[E.M.] and [El.M.] attend the preschool program at Caroline Sibley Elementary School and are meeting developmental milestones." Id. at 3.

court was not permitted to infer that Father abused his children. The trial court's finding of abuse is unsupported by any evidence at all and was thus clearly erroneous.

The trial court also found that Father "denied all services offered." Termination Order at 2. This too is unsupported by the evidence. One such service involved psychological counseling. The majority says that this finding read in context with another finding actually means that the trial court was referring to "Father's *pre-incarceration* refusal of services . . . ." Slip op. at 9 (emphasis in original). But a Case Manager's Progress Report dated July 31, 2009—two months before Father was incarcerated—reveals: "[Father] (E.M. and El.M's father) has made sporadic visits with his children. [Father] did provide an evaluation recently, but earlier declined anger management services when the children were removed from the home." CHINS Progress Report, July 31, 2009 at 4. The report is consistent with the Case Manager's testimony that "[t]here was a[] [psychological] evaluation completed for [Father]." Tr. at 89. It is clear that Father did engage in some services, though his participation was reluctant and less than satisfactory. And if, as the majority contends, the trial court was referring to an earlier point in time then the evidence does not support the trial court's finding. On review, we examine the findings the trial court *did make* and ask whether those support the judgment; we do not examine the evidence to justify findings the trial court *may have made*—but did not—that might have supported the judgment. In any event to say that Father denied "all services" is simply incorrect.

Once the foregoing clearly erroneous findings are set aside, the findings that remain are in my view wholly insufficient to support the trial court's judgment terminating Father's parental rights. More particularly there is scant evidence—and certainly not clear and convincing evidence—to support the conclusion that the condition resulting in the children's removal will not be remedied and that termination is in the children's best interest.

In order to terminate a parent's parental rights "the State must prove, by clear and convincing evidence, each and every element set forth in I.C. § 31-35-2-4(b)(2), (A)-(D)." In re G.Y., 904 N.E.2d 1257, 1261 (Ind. 2009), reh'g denied. Relevant for our purposes the statute provides the State must prove, "[t]here is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will

4

not be remedied." Ind. Code § 31-35-2-4(b)(2)(B)(i). Where the State fails to prove "any one" of the statutory elements "it is not entitled to a judgment terminating parental rights." G.Y., 904 N.E.2d at 1261.

In this case E.M. and El.M. along with five other of Mother's children were removed from the parents' home and placed in foster care because of "[Father's] abuse to [Mother] in the presence of the children." CHINS Pet. Feb. 24, 2009 at 2. There is evidence that on March 9, 2009—shortly after the children's removal—violence again erupted between Father and Mother. But there is no evidence of any domestic violence between Father and Mother after that date. The trial court seemed to fault Father for "contin[uing] to deny that he has issues with domestic violence." Termination Order at 2. The implication of course is that because Father apparently *had* issues of domestic violence in March 2009—and declined Court offered services for anger management—he still *has* such issues three years later. But Father has since engaged in anger management counseling and when questioned at the termination hearing acknowledged that he had "anger issues," had "gotten upset . . . beyond . . . necessity," "in instances [has] overreacted" and "could have responded better." Tr. at 190, 203, 204. Further, Father has long since stopped living with Mother and her five additional children and instead is residing in Illinois with his wife of fifteen years, Y.M., and their two children. There is no evidence that Father and Y.M. have ever had a violent relationship, nor is there evidence that Father's children with Y.M. or Y.M.'s two other children raised by Father have ever been the subject of state intervention.

Considering: (1) no evidence that there have been any instances of domestic violence between Father and Mother since 2009, three years before termination; (2) Father engaged in anger management counseling; (3) Father no longer lives with Mother but lives with his wife of many years in another state; and (4) no evidence of domestic violence between Father and his wife, it appears to me Father has actually carried a burden he has no duty to carry, namely, demonstrating that the conditions that led to the children's removal—domestic violence in the home of Father and Mother—no longer exists. Stated somewhat differently, the State has failed to show by clear and convincing evidence that the conditions that led to the children's removal will not be remedied. On this ground alone the State "is not entitled to a judgment terminating [this Father's] parental rights." G.Y., 904 N.E.2d at 1261.

5

Not only is there no clear and convincing evidence that the removal conditions will not be remedied, the evidence supporting the trial court's conclusion that termination of Father's parental rights is in the best interest of E.M. and El.M. is likewise deficient. Specifically, the trial court found that Father "has not seen his children in over two years," and that he and the children have not "bonded." Termination Order at 2, 3.

First, whatever bonding occurred before Father's incarceration—and the evidence is in conflict on this point—that bond obviously suffered during Father's incarceration. But unlike the situation with Mother's other children—the oldest of whom was age eleven at the time of termination—Father's children were only three and four years of age at the time of termination. We have previously determined that despite a father's lack of bonding, that is, "insufficient emotional attachment" with his two-year-old child, even with repeated visitation, was not sufficient to support terminating father's parental rights. See In re I.A., 934 N.E.2d 1127, 1135-36 (Ind. 2010). See also G.Y., 904 N.E.2d at 1265 (considering child's age of less than five years and mother's imminent release from prison in reversing termination).

Further, upon release from incarceration Father immediately contacted DCS to establish visitation with E.M. and El.M. but DCS denied his requests. See Tr. at 111. One might query how is bonding possible when the State denies the very avenue by which it might occur? Nevertheless, when Father and stepmother appeared at a June 1, 2012 CHINS Review Hearing, the trial court ordered DCS to "make copies of all documentation [Father] has and submit it to the Court. DCS is to begin an interstate compact[3] of [Father's] home in the State of Illinois for [El.M.]."[4] Review Hrg. Order, June 1, 2012 at 2. The record does not reflect the outcome of the

---

[3] "The Interstate Compact on the Placement of Children ("ICPC"), enacted in all fifty states, provides a mechanism by which children can be sent to new *foster or adoptive* homes across state lines. The ICPC includes a reporting requirement that allows a receiving state to investigate the fitness of the proposed home and to determine whether the child may be placed according to a proposed plan." In re Termination of Parent-Child Relationship of A.B., 888 N.E.2d 231, 234 n.3 (Ind. Ct. App. 2008) (citing I.C. § 31-28-4-1), trans. denied (emphasis added). We have recognized that no Indiana court has addressed the question of whether the ICPC applies to the interstate reunification of children with their *natural parents*, and other jurisdictions differ on the issue. See Bester v. Lake Cnty. Office of Family and Children, 839 N.E.2d 143, 145 n.2 (Ind. 2005).

[4] The court made no such order with regard to E.M., which would appear consistent with the court's notation that "[Father] is not the legal father of [E.M.]." Id. But curiously, DCS's Predispositional

6

interstate compact investigation. In similar fashion the record is silent on what occurred between June 2012—when the trial court anticipated the reunification of Father and El.M.—and July 2012 when the trial court determined that termination of Father's parental rights were in the best interest of E.M. and El.M because of Father's absence and lack of bonding. In my view there was no clear and convincing evidence on this point in June and the same was true a month later.

Finally, the majority invokes what it sees as the children's "paramount need for permanency" as support for the trial court's conclusion that termination is in E.M. and El.M.'s best interests. Slip op. at 12. I would first observe the trial court did not mention "permanency" as grounds for terminating Father's parental rights. The order of termination does say "the children deserve a loving, caring, safe, and stable home." Termination Order at 3. But this is an unassailable finding applicable to all children. The question is whether this finding "clearly and convincingly" supports the trial court's judgment of terminating this Father's parental rights. In my view it does not.

In any event, even if we assume that the older half-siblings who were school-aged suffered emotionally and behaviorally in the home of Father and Mother, and thus may have an urgent "need for permanency," there is simply no evidence in this record that either E.M. or El.M., ages three and four at the time of termination, have ever suffered emotionally or behaviorally. Further, to make permanency the lodestar of the analysis would invert it. The guiding principle is the child's best interests, and preserving a relationship with a fit parent is clearly in the best interest of the child. Cf. Wyle, supra at 35. As some commentators have noted, an overemphasis on permanency in the child welfare context can in some cases produce undesirable results. See, e.g., Paul Anthony Wilhelm, Note, Permanency at What Cost? Five Years of Imprudence Under the Adoption and Safe Families Act of 1997, 16 Notre Dame J.L. Ethics & Pub. Pol'y 617, 618-19 (2002) (asserting that the shift in national social policy focus from reunification to expeditious resolution of child welfare cases in the name of permanency has contributed to the breakup of families of lower socio-economic status); Madelyn Freundlich,

---

Report reflects that Father established paternity of E.M. by paternity affidavit. DCS's Predispositional Report of Oct. 23, 2008 at 5. See also Tr. at 71-72 (DCS case manager testifying that Father was listed on E.M.'s birth certificate).

Expediting Termination of Parental Rights: Solving a Problem or Sowing the Seeds of a New Predicament?, 28 Cap. U. L. Rev. 97, 107 (1999) (recognizing that when "permanency alternatives in the law are cast as a dichotomy: reunification . . . or termination . . ." other arrangements for maintaining a child's ties with birth families may not be pursued, ultimately to the detriment of the child's best interests).

Compounding the risks of institutionally overvaluing "permanency" is the present social reality of the increase in children living in families headed by single mothers. See Carmen Solomon-Fears, et al., Cong. Research Serv., R 41431, Child Well-Being and Noncustodial Fathers 1 (2013). The effects on children can be far-reaching, including poor school performance, emotional and behavioral problems, becoming teenage parents, and poverty. Id. We should encourage rather than frustrate the efforts a father makes in attempting to take responsibility in raising his child or children. And while social science research and child welfare advocates recognize "significant benefits to children when non-custodial fathers remain involved in their lives," slip op. at 12 (citation omitted), research also unfortunately indicates that "[h]istorically, [c]hild [w]elfare [s]ervices have systematically minimized the role and the involvement of the African-American father." Working with the African American Father: The Forgotten Parent, California Public Child Welfare Training Academy Trainer Guide at 3 (2009). In training child welfare personnel in working with African-American families, agencies "traditionally place[ ] most . . . emphasis on working with the mother with scant attention being paid to the father except as being an absent parent." Id.[5] Cf. Leslie Brown, et al., Manufacturing Ghost Fathers: The Paradox of Father Presence and Absence in Child Welfare, 14 Child & Family Social Work 25, 26 (2009) (observing in a study of Canadian child welfare cases that "fathers were rarely considered as placement resources, even when the alternative was permanent guardianship. Grandmothers, usually maternal, were more likely to be sought as a resource for children. Fathers who expressed interest in custody were typically told to get a lawyer . . . .").

---

[5] In this case the Case Manager testified that reunification with Father was never a part of the permanency plan for E.M. and El.M. See Tr. at 106-07.

The combination of an imperfect father, a system that presupposes the absence of African-American males from the household, and an institutional focus on permanency have all merged in this case resulting in the termination of "one of the most valued relationships in our culture." Neal, 796 N.E.2d at 285 (quotation omitted). This certainly cannot be in E.M and El.M's best interest.

It bears repeating that "termination is intended as a last resort, available only when all other reasonable efforts have failed." I.A., 934 N.E.2d at 1136. Of course it is true that we "need not wait until the child is irreversibly harmed . . . before terminating the parent-child relationship." Slip op. at 13 (quoting K.T.K., 989 N.E.2d at 1235 (quotation omitted)). But each case is different, each child is different, and each parent is different. And here I fail to see even the *potential* for harm to E.M. and El.M. from continuing their parent/child relationship with Father, especially considering the lack of evidence that violence in Father and Mother's home would not be (and had not already been) remedied, and that just a few weeks prior to termination the trial court ordered an interstate compact for possible physical placement in Father and stepmother's home in Illinois.

Finally, in affirming the trial court's judgment, the majority says: "the evidence here was close" and "the trial court could reasonably have reached either conclusion [to permit or deny the State's petition for termination of parental rights]." Slip op. at 14. But this is not a game of horseshoes and close is not good enough. In order to terminate a parent's parental rights the State must prove its case by clear and convincing evidence. It has failed to do so. Therefore I would reverse the trial court's judgment.

9